Filed 9/30/20 In re N.C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, CHILD WELFARE SERVICES BRANCH, <br><br> Plaintiff and Respondent, <br> v. <br> N.C., <br><br> Defendant and Appellant. | A157222 <br><br> (Humboldt County Super. Ct. No. JV180282) |

Appellant N.C. appeals from the juvenile court's denial of his request for presumed father status in dependency proceedings. He contends the juvenile court's order is not supported by substantial evidence.

**BACKGROUND**

Baby N.C., born in September 2018, tested positive for opiates, methamphetamine, and amphetamines at birth. Appellant had been in a romantic relationship with the mother throughout the pregnancy and was present at the birth. The baby had to be resuscitated by medical staff and was transferred that night to Oakland Children's Hospital for further medical care. A referral to the Humboldt County Department of Health and

1

Human Services (Department), stated that appellant and the mother had no baby supplies and "were 'passed out' asleep the entire time after the birth."

The mother had tested positive for opiates, methamphetamine, and amphetamines during her pregnancy, and appellant reported she had tried to stay away from drugs during the pregnancy but "had a couple slip-ups." The mother had entered a substance abuse treatment program at Progress House on September 11, 2018, and agreed to a family maintenance program. When the baby was released from the hospital the weekend of October 12, 2018, he joined the mother at Progress House. With the assistance of the Department, appellant entered a treatment program at another Progress House near the mother and the child in late October 2018.

On November 2, 2018, the mother was asked to leave her program for threatening physical harm to another resident. She did not immediately inform the Department where she was living, then made contact and agreed to return to Progress House, but on December 3, 2018, the day she was supposed to re-enter the program, she refused to do so.

Appellant completed his treatment program in early December, spent about two weeks in the program's transitional housing, and returned to Humboldt County around December 19 or 20, 2018. He was in contact with the Department social worker six times in December, beginning with December 3, about wanting to see and assume care for the child. Appellant told the social worker the mother was not speaking to him and expressed concern she might have relapsed; he was worried the child was not being properly supervised and said the mother was refusing to discuss custody and visitation with him. Progress House staff reported that appellant had done "very well" and was ready to care for the child, and recommended outpatient services; appellant was waiting for transitional housing that permitted

2

children.  The social worker reported that appellant had "shown that he wants to parent [the child]."

On December 17, 2018, the mother admitted to the social worker that she had used heroin recently, having left the child with her new boyfriend and his parents.  She reported that appellant was the child's father and the child "looked just like" appellant, but requested a paternity test; she was upset with appellant, saying he had not wanted her to have the child and, when she talked to him on the phone, he only wanted to discuss their relationship and did not care about the child's developmental changes.  She acknowledged she was legally married to another man, Samuel H., but said he was not the father and he was incarcerated in North Dakota when the child was conceived.

On December 19, 2018, the mother's probation officer found an empty syringe, two sharps containers, two empty beer bottles, and two spoons with white residue in the room where the mother and child were staying.

The child was taken into protective custody on December 21, 2018.  The detention report stated, among other things, that the mother had been evading the social worker, missing appointments and being untruthful about her whereabouts and substance use, had not followed through on developing a plan to maintain sobriety, and had hindered appellant's efforts to see the child.

The Department filed a dependency petition (Welf. & Inst. Code, § 300) on December 27, 2018, based on the mother's untreated substance abuse issues, her admitted use of heroin in December 2018, and the discovery of

drug paraphernalia in the room where she and the child were staying. The petition named both appellant and Samuel H. as alleged fathers.[1]

At the detention hearing on December 28, 2018, appellant was appointed counsel, who requested that appellant be elevated to presumed father status. The Department and counsel for the child opposed the request due to the existence of another alleged father. The mother confirmed that appellant was present at the child's birth and had a relationship with the child. The court reserved its decision on appellant's request, ordered genetic testing of appellant and the child, ordered temporary custody vested in the Department for detention in foster care and twice weekly visitation for appellant, and continued the matter for a jurisdictional hearing.[2]

After the hearing, appellant filed a "Statement Regarding Parentage" in which he stated he had told numerous people the child was his son, listing names of family, friends and acquaintances, and noted that the mother had named the child after him and he had attended multiple gynecologist appointments with the mother, been at the birth and stayed in the Bay Area for one week during the child's four-week hospitalization in Oakland.[3] Appellant indicated that although he had not yet been able to give the child anything, he had clothes, diapers, wipes, blankets, bedding, swaddles, bottles, pacifiers, toys, and other items for the child, and that the mother had denied him visitation for unknown reasons despite his attempts to contact

---

[1] On December 26, 2018, The Department mailed a JV-505 form and "Your Rights" brochure to Samuel H. at his last known address.

[2] The court subsequently filed an order on January 28, 2019, directing for immediate genetic testing.

[3] Appellant also filed a "Parental Notification of Indian Status" form, stating he had no known Indian ancestry.

4

her, arrange for visitation, establish a bond with the child, and discuss the child's future housing and welfare.

The Department's jurisdiction report reiterated that the mother and appellant both reported appellant was the biological father and that the mother had "evaded [appellant] in his efforts to see the child by refusing to disclose the child's location." At the jurisdiction hearing on January 16, 2019, appellant's attorney represented that appellant was requesting presumed father status regardless whether he was determined to be the biological father. The juvenile court sustained the petition, finding the child came within the provisions of Welfare and Institutions Code section 300, subdivision (b), and authorized unsupervised visitation for appellant.

On January 24, 2019, the Department reported that its search for Samuel H. had been unsuccessful.

The disposition report again reiterated that the mother had thwarted appellant's efforts to see the child by refusing to provide his location. The mother had told the social worker appellant was not interested in the child before he was born, implied he had not purchased any baby supplies, and said appellant did not have a place to live and she was trying to get a restraining order against him.

According to the report, appellant had completed treatment at Progress House, as well as six weeks of anger management; had obtained a studio apartment in Humboldt County; was employed and seeking a second job; had attended Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings and had support from his sponsor, family and friends; and had tested negative for all controlled substances on January 21, 2019. The Department reported that appellant loved the child very much and said "loving [the child] keeps him happy." Appellant told the social worker the child needs someone to take

5

care of him and love him; it was important for the child to have educational opportunities and a healthy home life and healthy relationships, "beginning with their parent and child relationship"; and both appellant and the child needed an environment with structure and routine so they would maintain physical health, well-being and emotional health. He requested funds to attend another "Love and Logic" parenting class, saying "[i]t gives me more tools to learn to be a better parent." Appellant was reported to be appropriate and affectionate with the child at supervised visits in January 2019, and the social worker agreed to approve appellant's mother, who had been attending the supervised visits, to serve as visitation supervisor.[4]

The Department recommended that appellant be elevated to presumed father status, that the child be placed with him, and that appellant be offered family maintenance services. The child, at this time, was in his second foster care placement and adjusting well.

At a hearing on January 31, 2019, counsel for the mother objected to elevating appellant to presumed father status and to his request for overnight visits because the DNA results were still pending. Appellant's attorney reiterated that even if he was not the biological father, he was seeking presumed father status on the basis of having accepted the child into his home and held him out as his child, and suggested appellant might qualify for presumed father status under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*) due to the mother's attempt to prevent his contact with the child. The court declined to modify any orders. Subsequently, on

---

[4] Appellant had requested unsupervised visits; the social worker explained that one of the attorneys had asked to review documentation about how the supervised visits had been going.

February 13, 2019, the court modified the visitation order to include overnight visits.

On March 11, 2019, the Department reported that DNA testing excluded appellant as the child's biological father. Appellant continued to request presumed father status and questioned the paternity test results. The matter was continued for efforts to identify other possible fathers, and then for the Department to conduct a second DNA test on appellant and test a newly identified alleged father, Brett M. Meanwhile, appellant reported that the Department had restricted him to supervised visits and the court ordered the Department to resume visitation as previously ordered if it had restricted the visits only because appellant was not the biological father.

On April 15, 2019, the Department reported that the second DNA test results confirmed appellant is not the child's biological father and recommended that presumed father status be denied and appellant's visitation discontinued. Appellant maintained he met the criteria for presumed father status under Family Code section 7611, subdivision (d).[5]

At the outset of the contested disposition hearing, held on May 3 and 10, 2019, counsel for the minor and the mother objected to appellant's request for presumed father status, while counsel for Brett M. represented he was waiting to take a DNA test and, if he was the biological father, would return to court to be deemed a presumed father under *Kelsey S.*

Appellant testified that he and the mother began a romantic relationship around the first week of January 2018. They were both homeless and lived together in appellant's truck. Appellant suspected the mother was pregnant in February, suggested she take a pregnancy test, and

---

[5] Further statutory references will be to the Family Code unless otherwise specified.

7

went with her to buy one. When she tested positive, the mother was shocked and did not want to talk about it for a few days, while appellant was very excited. He was involved throughout the pregnancy: He went to the first Planned Parenthood visit, an ultrasound, and all the gynecologist appointments, and was present at the birth. Asked whether he introduced himself as the father at medical appointments, appellant testified he did not need to, as it was assumed, he was the father. Appellant testified that from the day he bought the pregnancy test, he wrote everything pertaining to the child on a calendar he intended the child to be able to look at later, explaining, "I grew up without my dad, so to me it was important for him to see that his father cared."[6]

Asked whether he offered the mother support during the pregnancy, appellant testified he was "around her all the time" and "helped feed her," mowing lawns or doing whatever he could to come up with money. Asked if he paid for any of her expenses, he testified, "me and her both pretty much did everything together, so yeah." The prenatal medical appointments were covered by Medi-Cal. Appellant's father paid for a motel room for appellant and the mother to stay in, and his mother offered some support. Appellant helped the mother pursue benefits for the child, but this was limited because the mother was on felony probation. They did successfully get WIC (Women, Infants, and Children Program). Asked whether he "prepared for the baby's arrival," appellant testified that his focus was on getting a job and "getting my life together" while the mother's was "more on items for the baby."

---

[6] Appellant acknowledged that he left out negative things, like the mother's drug use, that there were things written on the calendar that would have to be removed because they were inappropriate for a child to see, and that it was "actually a pretty crappy calendar" and he intended to transfer his notes onto a whole new one.

Appellant testified that he told "[p]retty much everyone" about the pregnancy and that he was the father, including several posts on Facebook. He tried to bond with the baby before birth by reading to the mother and baby from a pregnancy book they used to keep track of the stages of development, and he got a stethoscope and would listen to the baby's heartbeat and try to talk to the baby.

Appellant and the mother "started to separate" a few months before the baby was born. Appellant went to the hospital when he learned the mother had gone into labor, and he spent about 10 days living out of Oakland Children's Hospital while the baby was there. After the mother and baby were discharged to Progress House, appellant went to the "sister rehab" for men next door so he could visit them. Before he was able to gain admission, appellant would call the mother and she would put the phone by the baby's ear so appellant could talk to him. After the mother left the program, she stopped communicating with appellant.

Appellant testified that it was the mother's idea to name the child after him. He was not allowed to put his name on the birth certificate when the baby was born because the mother was married to someone else, and was unsuccessful when he tried to have his name added later. Appellant tried to initiate a family law case in December 2018.

After appellant got out of the treatment program, he found a job and housing and bought baby supplies, including a car seat, a co-sleeper, clothes, and food. As of the disposition hearing, appellant had been visiting the child at least twice a week and had had two overnight visits; it had been hard to coordinate more because he worked nights. He testified that he had been in the process of setting up childcare with the child's foster mother but had not been able to move forward with this since paternity came into question,

9

although he was convinced the foster mother would still be willing if appellant was given custody. Appellant had income to support the child and was willing to do so until he reached adulthood, and was willing to pay child support if he was determined to be the child's father. He testified, "I have been [the child's] father since before he was born, so I . . . would like it to stay that way" because "I have a personal bond with him already."

Appellant acknowledged that the mother had a "pretty significant" drug history and that he used methamphetamine with her several times a week; he testified that his own use had been minimal before he got involved with the mother, but then "we were go, go, go nonstop." It was usually the mother who would get the methamphetamine, but he would drive her to get it. He testified that the mother also used heroin daily throughout the pregnancy. Although he was spending less time with the mother the three months before the baby was born, appellant was sure she was using drugs during that period. Asked whether, when he was using methamphetamine with the mother, he was concerned he might be damaging the baby, appellant responded, "[a]ll the time." He testified that he encouraged the mother to stop using drugs for the sake of the baby, including contacting the mother's probation officer and getting the mother to agree to a "warrant surrender," but the mother then decided not to do this. She was arrested about a week later and released into a program, but left on the first day despite appellant's efforts to convince her to stay. Appellant did not think the mother disclosed her drug use to her doctor but the doctor "seemed pretty aware" and appellant was "fairly certain" he knew or suspected. Asked if he told the doctor about the mother's heroin use, appellant said he did not speak to the doctor much and when he did, it "just kind of got pushed to the side."

10

Appellant acknowledged thinking the baby's health would have been better off if the doctor had known about the drug use.

Asked about domestic violence issues, appellant testified that the mother was very abusive. He was aware the mother told the Department she was the victim of domestic violence by him and was not surprised, because "she does tend to be a little bit of a pathological liar about things."[7]

Appellant testified that he first held the baby the second night after his birth. After the baby was discharged from Oakland Children's Hospital, appellant saw him on November 2, 2018, then did not see him until January 2019, after the dependency case had started.

Appellant had been clean since about October 15, 2018, and had not relapsed since then. An assessment in December or January indicated he should do outpatient services, but he was offered a job that conflicted with the services, and the Department agreed he should take the job. He went to AA/NA meetings as often as possible; his agreement with the Department specified three times a week. He had completed one parenting class and started the follow-up for older children, but was not able to continue it due to his work schedule. He was willing to do domestic violence services and any services the Department recommended for him.

Appellant argued he met the criteria to be a presumed father under section 7611, subdivision (d), based on his open acknowledgement of the child

---

[7] Appellant testified that the mother became "pretty hostile" around twice a month, and he was concerned these incidents could put the baby at risk. He estimated there were around 15 incidents of physical abuse between January and September 2018. Asked to describe the most serious incident, appellant described the mother "leaning back in the seat [of a vehicle] and just proceeded to drill me repetitively with her feet, to the point where my mom even came out and was, like, 'I'm going to call the cops on you if you don't stop.' "

11

as his son, involvement during the pregnancy and having established a home for the child. The Department argued appellant and did not have the established relationship with the child that section 7611 was intended to preserve, had not identified himself as the father at the mother's medical appointments, informed the mother's doctors of her substance abuse, or paid pregnancy or birth expenses, and did not take legal action to establish paternity until three months after the baby was born. Counsel for the child argued that appellant's use of methamphetamine with the mother during her pregnancy was not the action of a caring father, most of his visits with the child prior to the dependency case were while the child was hospitalized due to the severe health issues caused by the drug use, and appellant's visits during the dependency case were based on "bad information" (albeit given in good faith) that appellant was the biological father. The mother maintained that appellant's two overnight visits with the child during the dependency case were insufficient to show he received the child into his home as contemplated by the statute; appellant failed to prove presumed father status would further the integrity of the family; and application of the presumption would not be in the child's best interest in light of appellant's failure to report the mother's substance abuse to her medical providers.

The juvenile court denied appellant presumed father status and ordered his visitation with the child suspended after a "goodbye" visit, thus terminating appellant's role as a party in the case. The court concluded that although appellant "clearly thought that he was the biological father" and had "done a lot to improve his own life in the case," the "reasons for the presumed status . . . really doesn't apply in this case."

This appeal followed.

## DISCUSSION

" 'Dependency law recognizes three types of fathers: presumed, alleged and biological.' (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1208.) A biological father is one whose paternity of the child has been established, but who has not established that he qualifies as the child's presumed father under Family Code section 7611. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15.) 'A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an "alleged" father.' (*Ibid.*)

" 'A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled. [Citation.] . . . Presumed father status entitles the father to appointed counsel, custody (absent a finding of detriment), and a reunification plan. [Citation.]' (*In re T.R., supra,* 132 Cal.App.4th [at p.] 1209.) The court *may* provide reunification services to a biological father, if it determines that the provision of services will benefit the child. ([Welf. & Inst. Code,] § 361.5, subd. (a).) Due process for an alleged father requires only that he be given notice and an opportunity to appear and assert a position and attempt to change his paternity status, in accordance with procedures set out in [Welfare and Institutions Code] section 316.2. (*In re Paul H.* (2003) 111 Cal.App.4th 753, 760.) He is not entitled to appointed counsel or to reunification services. (*Ibid.*)" (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1120.)

"The purpose of presumed parentage, in the dependency context, is '[t]o identify [persons] who, by reason of their parenting relationship, are entitled to seek reunification services and custody.' (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 802 (*Jerry P.*).) The 'elevated status' of presumed

13

parenthood is intended to ' "distinguish those who have demonstrated a commitment to the child regardless of biology." ' (*Martinez v. Vaziri* (2016) 246 Cal.App.4th 373, 377." (*In re Alexander P.* (2016) 4 Cal.App.5th 475, 485.)

"Presumed father status is governed by section 7611, which sets out several rebuttable presumptions under which a man may qualify for this status, generally by marrying or attempting to marry the child's mother or by publicly acknowledging paternity and receiving the child into his home." (*In re M.R.* (2017) 7 Cal.App.5th 886, 898.) Here, appellant relies upon subdivision (d) of section 7611, which applies where the parent " 'receives the child into his [or her] home and openly holds out the child as his [or her] natural child.' " Appellant "has the burden of establishing, by a preponderance of the evidence, the facts supporting that entitlement." (*In re T.R., supra,* 132 Cal.App.4th at p. 1210.) We review the juvenile court's finding regarding presumed father status for substantial evidence, "drawing all reasonable inferences and resolving conflicts in the evidence in favor of the trial court's ruling, and refraining from any reweighing of the evidence." (*In re M.R.*, at p. 898.)

"In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own (§ 7611, subd. (d)), courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the

14

child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental." (*In re T.R., supra,* 132 Cal.App.4th at p. 1211.) Hence the factors appellant relies upon here, as he did in juvenile court: He suggested the mother take a home pregnancy test and was present when she did; he was involved throughout the pregnancy, attending the mother's appointments with Planned Parenthood and her gynecologist, and for an ultrasound; he told "pretty much everyone" about the pregnancy and that he was the father; he helped feed the mother during her pregnancy and his relatives provided some support; he was present for appointments to get WIC and food stamps for the mother; he was present at the baby's birth and stayed for a week at the hospital in Oakland while the baby was there; after completing treatment, he got a job, housing, and supplies for the baby; he visited the child twice a week and had two overnight visits; and he expressed willingness to support the child until adulthood.

The record leaves no doubt that appellant openly held out the child as his natural son and believed he was the biological father until the DNA tests established he was not; the mother, too, presented appellant as the natural father, telling the social worker he was the biological father and the child looked just like him, and naming the child after appellant.

Recognizing that he does not meet the literal requirement of section 7611, subdivision (d), that a presumed father receive the child into his home, appellant argues he was prevented from physically bringing the child into his home by the mother and the child's hospitalization.

Much of appellant's argument on appeal derives from *Kelsey S., supra,* 1 Cal.4th 816, in which "the Supreme Court recognized under section 7611, subdivision (d) a father who would become a 'presumed father' does not have

15

exclusive control over the means to achieve that status. No matter how loving, caring, giving, and nurturing he is, control over a man's presumed father status ultimately rests with the mother, or in some cases a third party. This is because the mother cannot be forced to allow the father to take the child into his home. In addition, there will be cases where the father cannot physically take the child into his home because, for example, the [Los Angeles County] DCFS has taken custody of the child or the child, due to illness or birth defect, must remain in the hospital." (*Jerry P., supra,* 95 Cal.App.4th at p. 807, fns. omitted.)

*Kelsey S.* involved a biological father who sought to prevent the mother from placing the child for adoption but, under the governing statutes, had no right to do so unless he was a presumed father. (*Kelsey S., supra,* 1 Cal.4th at pp. 823–824.) *Kelsey S.* rejected the argument that section 7611 could be satisfied by constructive receipt (*id.* at p. 829), but held the statutory scheme "violates the federal constitutional guarantees of equal protection and due process for unwed fathers *to the extent that* the statutes allow a mother unilaterally to preclude her child's biological father from becoming a presumed father and thereby allowing the state to terminate his parental rights on nothing more than a showing of the child's best interest. If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (*Id.* at p. 849.)

16

*Jerry P.* applied this reasoning to the dependency context and to a man who was not the biological father. (*Jerry P., supra,* 95 Cal.App.4th at pp. 812–813, 816.) Reversing a juvenile court's denial of presumed father status based solely on the fact the man had not received the child into his home, *Jerry P.* held section 7611 and the dependency scheme "violate the constitutional rights of a man seeking presumed father status to the extent they permit a mother or third person to unilaterally deny him that status by preventing him from receiving the child into his home," including "men who are not biological fathers but who meet the other criteria for presumed father status under the . . . *Kelsey S.* decision." (*Jerry P.,* at p. 797.) "[A] man is entitled to protection from invidious discrimination in attempting to attain presumed father status if (1) once he 'knows or reasonably should know of the pregnancy, he . . . promptly attempt[s] to assume his parental responsibilities as fully as the mother will allow and his circumstances permit,' and (2) 'is indisputably ready, willing, and able to exercise the full measure of his parental responsibilities . . . . [¶] . . . [¶] . . . emotional, financial, and otherwise.'" (*Jerry P.,* at pp. 816–817, quoting *Kelsey S.,* 1 Cal.4th at pp. 847, 849, fns. omitted.)

Appellant did not make any argument based on *Kelsey S.* in juvenile court and, under familiar principles of appellate review, cannot raise this issue for the first time on appeal. (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582.) Appellant's arguments in the proceedings below were entirely based on section 7611, subdivision (d): He argued that he met the requirements for application of the statutory presumption, and emphasized that there was no

other father figure for the child.[8]  Argument that the statutory requirements of section 7611, subdivision (d), have been established is not sufficient to inform the juvenile court that a man is pursuing the *constitutional* rights protected by *Kelsey S.* and *Jerry P.*  (*In re Elijah V.,* at p. 582.)

Nevertheless, we have discretion to consider forfeited claims.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  Here, we choose to exercise this discretion because of the significance of the interest at stake and indication in the record that the absence of a biological tie between appellant and the child was given undue emphasis in the juvenile court.

The Department's reports describe appellant as having consistently asserted his desire to parent the child, regardless of his relationship with the mother, at least from early December 2018, when he completed his treatment at Progress House.  Prior to receipt of the DNA test results, the Department reported that appellant "appear[ed] ready to assume custody of [the child]" and recommended that appellant be elevated to presumed father status and

---

[8] Appellant's at issue memorandum presented a purely statutory argument for presumed father status under section 7611, subdivision (d), including that appellant received the child into his home "to the fullest extent possible within his ability to do so."  He argued that this presumption rebutted the presumption that the mother's legal husband was the father (§ 7611, subd. (a)), and that failing to find appellant the presumptive father would leave the child fatherless.

Appellant's closing argument at disposition argued the only reason Department changed its recommendation that appellant be granted presumed father status was discovery he was not the biological father, which caselaw confirms is not a necessary requirement; that no other father figure was visiting the child; that appellant had "established a home" for the child, visited as much as he could and had two overnight visits; that he met the section 7611, subdivision (d), requirements despite not having a biological connection to the child; and that despite the drug use during the mother's pregnancy, appellant had turned his life around.

18

given custody of the child with family maintenance services. After the DNA results excluded appellant as biological father, the Department recommended that he not be made a presumed father and that his visitation be terminated. The Department gave no reason for its change of position other than the paternity test results.

As the caselaw described above makes clear, biology is not the determinative factor in determining whether a man is a presumed father. " 'A man's parentage of a child may be undisputed and legally proven, but he may nevertheless fail to be a "presumed father". . . . Conversely, even if paternity is denied *and legally disproved*, a man may be deemed, under some circumstances, to be a "presumed father." ' " (*Jerry P., supra,* 95 Cal.App.4th at p. 805, quoting *Kelsey S., supra,* 1 Cal.4th at p. 823, fn. 3.)

Citing *In re T.R., supra,* 132 Cal.App.4th at pages 1209–1210, the Department suggests the juvenile court could have reasonably determined appellant acted in a manner contrary to parental responsibility by supporting and facilitating the mother's drug use during pregnancy. Appellant admitted he used methamphetamine with the mother several times a week, knew she was using heroin daily, and facilitated her drug use by taking her to get drugs. Despite knowing the drug use could harm the baby, appellant did not tell the mother's doctor about it. He minimized the drug usage in talking with the social worker, saying the mother had tried to stay away from drugs during the pregnancy but "had a couple of slip-ups."

*In re T.R., supra,* 132 Cal.App.4th at page 1211, held the section 7611, subdivision (d), presumption inapplicable to a stepfather who had shared a home with the mother and child for seven years, held the child out as his and provided financial support, but who was a registered sex offender and was found to have molested the child. The court found the stepfather's conduct

19

was "antithetical to a parent's role," "a blatant violation of parental responsibilities" and "more than counterbalanced the factors favoring [his] presumed father status," explaining that "the premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare—regardless of whether he is biologically the father—is entitled to the elevated status of presumed fatherhood. (See *In re Zacharia D.*[, *supra*,] 6 Cal.4th [at p.] 451.) 'In dependency proceedings . . . the purpose of section 7611 . . . is to determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights *not* afforded to natural fathers—the rights to reunification services and custody of the child.' (*Jerry P., supra,* 95 Cal.App.4th at p. 804.) If an individual can qualify for presumed father status based on his good deeds consistent with parental responsibilities, it follows that under certain circumstances he can be disqualified by repugnant conduct that is detrimental to the child." (*In re T.R., supra,* 132 Cal.App.4th at p. 1212.)

Certainly, this reasoning can be applied, to some extent, to appellant's disregard for the consequences of the mother's substance abuse on the unborn child's health. But the situation in the present case is quite different from that in *In re T.R.* While by no means an excuse, it bears noting that appellant was experiencing his own addiction while the mother was pregnant. After the baby's birth, appellant entered and completed treatment, and—as far as the present record discloses—turned his life around. As of the disposition hearing, his success in establishing a home and the ability to care for and support the child, and consistent effort to visit and demonstrate his commitment to caring for the child since birth, appear to us more potent factors in the analysis than his admittedly "serious transgression[s]" while the mother was pregnant.

20

The Department also emphasizes that, like the section 7611, subdivision (d), presumption, the constitutional interest protected by cases such as *Kelsey S.* and *Jerry P.* is in an existing parental relationship. (*In re D.M.* (2012) 210 Cal.App.4th 541, 553–554.) "*Jerry P.* was careful to describe the constitutional interest as the man's interest in '*maintaining* his relationship with the child.' " (*In re D.M.,* at p. 553.) "[W]e presume a person is a child's father, notwithstanding the absence of a biological connection, in order to protect a developed familial relationship. Although a man with no biological connection to the child, no marital connection to the mother, and no way to satisfy the statutory presumption of paternity may nevertheless be deemed a presumed father, he must do more than simply show that he has done all he can under the circumstances to assert a right to parent. He must prove that he has an existing familial relationship with the child such that his rights deserve the same level of protection as those of a biological mother. (Cf., *Kelsey S., supra,* 1 Cal.4th at p. 849.) A biological father is not entitled to custody or to reunification services merely because he wants to establish a personal relationship with his child. (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160.) Likewise, an unmarried man who is not biologically related to the child is not entitled to custody or to reunification services merely because he wants to be the parent." (*In re D.M.*, at p. 554.)

The Department focuses on the facts that appellant did not see the child from November 2, 2018, until January 2019, and then only in the context of visitation through the dependency case. But with the mother refusing to allow appellant contact with the child and appellant in residential drug treatment until early December, shortly before the dependency petition was filed, it is not apparent how appellant could have done more to see the child during this period. According to the Department's reports, appellant

21

was asking the social worker about visiting and assuming care for the child from at least December 3, 2018.

The Department faults appellant for being unable to see the baby after the baby was discharged from the hospital due to appellant's own inpatient treatment, citing *Adoption of O.M.* (2008) 169 Cal.App.4th 672, 675.  In that case, while the biological father's efforts to assume parental responsibilities were frustrated by the mother's termination of their relationship and relinquishment of the child for adoption, the court held the father was impeded "to a far greater extent by the predictable consequences of his own criminal activity," which resulted in him serving a lengthy prison term. (*Ibid.*)  Appellant's need for inpatient treatment obviously was due to his substance abuse and, thus, a consequence of his own poor choices and unlawful activity, but his decision to voluntarily enter treatment was an attempt to address and overcome his addiction not only for his own benefit but also for the benefit of the child he believed to be his son.

In explaining its denial of appellant's request for presumed father status, the juvenile court referred generally to the law described by the parties opposing the request.  As earlier described, these parties emphasized appellant's contribution to and failure to protect the child from the mother's substance abuse during pregnancy, and argued he did not have a sufficiently established relationship with the child to warrant presumed father status. The court remarked that appellant's request created a "legal nightmare," apparently with reference to the child's right to know his biological father, that father's right to attempt reunification, and the likelihood of ongoing "disputes in family law court because of the issues and differences between" appellant and the mother.  To the extent appellant "promptly [came] forward and demonstrate[d] a full commitment to his parental responsibilities—

22

emotional, financial, and otherwise" (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849), however, the facts that he had differences with the mother or that the biological father might enter the picture and attempt to assert rights would not be sufficient reasons to deny presumed father status. Differences with the mother are inherent where a man's claim to presumed father status depends on showing the mother prevented him from doing more to fulfill his parental responsibilities. At the point the juvenile court denied appellant's request, no other man was seeking presumed father status. The prospect that a newly identified possible biological father might assert conflicting rights might have justified delaying a decision to enable the court to weigh the competing "considerations of policy and logic" (§ 7612, subd. (b)), but denying appellant's request immediately terminated his ability to maintain a relationship with the child even if no biological father sought to establish one.

The record demonstrates that appellant felt a strong connection to the child he believed was his from the time of conception. His attention and efforts were obviously marred during the pregnancy by his and the mother's substance abuse and homelessness. But appellant got himself clean and turned his life around, and as soon as the mother started to prevent him from having contact with the child, he began consistent efforts to see and assume care of the child. Even the Department recommended presumed father status—until it was discovered that appellant was not the biological father. On this record, we cannot find the court's decision supported by substantial evidence.

But we cannot simply declare appellant a presumed father, as he requests. More than a year has passed since the disposition hearing, and we know nothing about appellant's or the child's current situation. Instead, we will remand for the juvenile court to reconsider appellant's request for

presumed father status in light of the views we have expressed in this opinion.

## DISPOSITION

The orders denying appellant's request for presumed father status and terminating visitation are vacated.  The matter is remanded for reconsideration in light of the views expressed in this opinion.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*In re N.C.* (A157222)